******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ECKER, J., with whom PALMER and McDONALD, Js., join, concurring. I agree with and join Chief Justice Robinson's opinion holding that neither the virtual infancy nor the interference exception to the statutory lack of an ongoing parent-child relationship ground for the termination of parental rights is applicable to the facts of this case, and, therefore, I am compelled to conclude that the parental rights of the respondent father, Aceion B., properly were terminated, even though he was incarcerated for most of his young child's life. I write separately to describe very briefly the social reality operating beneath the surface of this and many other such cases involving incarcerated parents who lose their children as a collateral consequence of the separation that incarceration entails. The problem I describe is not, in my opinion, well suited for judicial resolution on a case-by-case basis in the first instance, at least in the absence of more particularized legislative guidance regarding the proper legal considerations and standards that judges should take into account when deciding these cases. A legislative solution also offers the advantage of including nonjudicial remedial components that the legislature may deem necessary and appropriate on the basis of the many policy considerations that presumably would inform any such initiative.

There are approximately 2.2 million people incarcerated in the United States, and more than half of them have children under the age of eighteen. E. Hager & A. Flagg, The Marshall Project, "How Incarcerated Parents Are Losing Their Children Forever," (December 2, 2018), available at http://www.themarshallproject.org/2018/12/03/how-incarcerated-parents-are-losing-their-children-forever (last visited December 30, 2019); see also 3 M. Mushlin, Rights of Prisoners (4th Ed. 2009) § 16:4, pp. 488–90. Of the estimated 74 million children in the United States in 2007, 2.3 percent, or approximately 1.7 million children, had an incarcerated parent. L. Glaze & L. Maruschak, Office of Justice Programs, United States Department of Justice, "Parents in Prison and Their Minor Children," Bureau Just. Stat. Spec. Rep. (Rev. March 30, 2010) p. 2, available at http://www.bjs.gov/content/pub/pdf/pptmc.pdf (last visited December 30, 2019). These statistics are even bleaker in minority communities; "[one] in [ten] black children have a parent behind bars, compared with about [one] in [sixty] white youth . . . ." E. Hager & A. Flagg, supra.[1]

The rise in incarceration rates over the past fifty years has been the subject of much attention and controversy. See, e.g., National Research Council et al., "The Growth of Incarceration in the United States: Exploring Causes and Consequences" (J. Travis et al. eds. 2014) p. 260 (reporting on recent study showing that number of chil-

dren with father in prison rose from 350,000 in 1980 to 2.1 million in 2000, or "about 3 percent of all U.S. children in 2000"). Whatever its causes, the rise in the United States prison population has coincided with changes in child welfare policy, which are intended "to reduce children's stay in foster care in favor of a permanent home . . . ." A. Iskikian, Note, "The Sentencing Judge's Role in Safeguarding the Parental Rights of Incarcerated Individuals," 53 Colum. J.L. & Soc. Probs. 133, 135 (2019). Under the Adoption and Safe Families Act, for example, "the State shall file a petition to terminate the parental rights of" a parent whose child "has been in foster care under the responsibility of the State for 15 of the most recent 22 months . . . ."[2] 42 U.S.C. § 675 (5) (E) (2012). Because the average sentence of incarceration exceeds fifteen months,[3] incarcerated parents whose children are placed in foster care have their parental rights terminated at a "disproportionate rate . . . ." A. Iskikian, supra, 135. Indeed, "[o]ne in eight children placed into foster care due to a parent's incarceration alone will lose that parent forever." E. Hager & A. Flagg, supra. "Female prisoners, whose children are five times more likely than those of male inmates to end up in foster care, have their rights taken away most often." Id.

Part of the problem fueling this "family separation crisis"; (internal quotation marks omitted) id.; is the fact that many termination of parental rights statutes, like General Statutes § 17a-112 (j) (3) (D), focus on the existence of an "ongoing parent-child relationship." See generally G. Sarno, Annot., "Parent's Involuntary Confinement, or Failure to Care for Child As Result Thereof, As Evincing Neglect, Unfitness, or the Like in Dependency or Divestiture Proceeding," 79 A.L.R.3d 417 (1977). In Connecticut, an "ongoing parent-child relationship" is statutorily defined as "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child . . . ." General Statutes § 17a-112 (j) (3) (D). A parent who is separated from his or her child by a sentence of incarceration cannot develop and/or maintain the type of parent-child relationship that ordinarily results from day-to-day contact. Although this court has been careful to "avoid placing insurmountable burden[s] on noncustodial parents" by "explicitly reject[ing] a literal interpretation of the statute," we nonetheless find ourselves constrained by the language of the statute to require, at the very least, a showing that "the child has some present memories or feelings for the natural parent that are positive in nature." (Internal quotation marks omitted.) *In re Jacob W.*, 330 Conn. 744, 757, 200 A.3d 1091 (2019).

I am inclined to believe that many incarcerated parents—including loving and devoted parents—could have tremendous difficulty making the required showing under some circumstances. As this court has

acknowledged, "when a parent has been incarcerated for much or all of his or her child's life . . . the normal parent-child bond that develops from regular contact . . . is weak or absent." (Internal quotation marks omitted.) Id., 756–57. The fact of incarceration also interferes with "the parent's ability to make and demonstrate the changes that would enable reunification of the family"; (internal quotation marks omitted) id., 756; because incarcerated parents cannot attend juvenile court hearings, visit the child, attend parenting classes, or provide financial support. A. Iskikian, supra, 53 Colum. J.L. & Soc. Probs. 158–59. "Parents in prison thus face a high likelihood of incurring the double punishment of both incarceration and the permanent deprivation of their relationship[s] with their children." Id., 165–66. Depending on the age of the child, the financial resources of the family, the willingness of the custodial parent or guardian to facilitate contact, and the resourcefulness of the incarcerated parent and his or her ability to navigate the maze of logistical impediments that accompany the loss of liberty in prison, it may be difficult or impossible for the incarcerated parent to meet the existing statutory standard.

Several states have responded to this increasingly serious problem by enacting legislation to protect the fundamental rights of incarcerated parents and to preserve the parent-child bond. For example, California and New York have enacted legislation requiring that incarcerated parents be provided with reunification services, such as parenting classes and visitation with their minor children. See Cal. Welf. & Inst. Code § 361.5 (e) (1) and (2) (Deering Supp. 2018);[4] N.Y. Soc. Serv. Law § 384-b (7) (f) (McKinney Cum. Supp. 2019).[5] Nebraska and New Mexico have gone even further by enacting legislation prohibiting the state from terminating parental rights if the sole basis for the termination is parental incarceration. See Neb. Rev. Stat. § 43-292.02 (2) (b) (Cum. Supp. 2018);[6] N.M. Stat. Ann. § 32A-4-28 (D) (2010).[7]

Within constitutional limits, it is a question of public policy how best to strike the appropriate balance between and among the competing values and interests at stake, and, "[i]n areas where the legislature has spoken . . . the primary responsibility for formulating public policy must remain with the legislature." *State* v. *Whiteman*, 204 Conn. 98, 103, 526 A.2d 869 (1987). As I previously explained, § 17a-112 (j) (3) (D) in its present form plainly provides for the termination of parental rights if, among other things, the child has no positive memories or feelings for the natural parent. Despite the nearly insurmountable hurdles posed by incarceration to many inmates who find themselves unable in the prison setting to develop and maintain the parental relationship necessary to satisfy the statutory standard, I agree with Chief Justice Robinson's opinion holding that the trial court did not commit error

applying the statutory standard on this record. Accordingly, I concur in Chief Justice Robinson's opinion.

[1] The statistics recited in this concurring opinion reflect national data and are not specific to Connecticut. I would be surprised if the relevant statistics in Connecticut differed materially from the national numbers, but I cannot be certain because the local information is not readily available. The need for more empirical information of this kind is another reason why the legislature is far better equipped in the first instance to consider the matter and devise proper legal standards for case-by-case application.

[2] Connecticut has codified this federal statutory requirement at General Statutes § 17a-111a (a), which provides in relevant part that "[t]he Commissioner of Children and Families shall file a petition to terminate parental rights pursuant to section 17a-112 if (1) the child has been in the custody of the commissioner for at least fifteen consecutive months, or at least fifteen months during the twenty-two months, immediately preceding the filing of such petition . . . ."

[3] "The average time served by state prisoners released in 2016, from their date of initial admission to their date of initial release, was 2.6 years. The median amount of time served (the middle value in the range of time served, with 50 [percent] of offenders serving more and 50 [percent] serving less) was 1.3 years . . . ." D. Kaeble, Bureau of Justice Statistics, Office of Justice Programs, "Time Served in State Prison, 2016," U.S. Dept. Just. Bull., November, 2018, p. 1, available at http://www.bjs.gov/content/pub/pdf/tssp16.pdf (last visited December 30, 2019).

[4] Section 361.5 (e) of the California Welfare and Institutions Code provides in relevant part: "(1) If the parent or guardian is incarcerated, institutionalized, or detained by the United States Department of Homeland Security, or has been deported to his or her country of origin, the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child. In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime or illness, the degree of detriment to the child if services are not offered and, for children 10 years of age or older, the child's attitude toward the implementation of family reunification services, the likelihood of the parent's discharge from incarceration, institutionalization, or detention within the reunification time limitations described in subdivision (a), and any other appropriate factors. In determining the content of reasonable services, the court shall consider the particular barriers to an incarcerated, institutionalized, detained, or deported parent's access to those court-mandated services and ability to maintain contact with his or her child, and shall document this information in the child's case plan. Reunification services are subject to the applicable time limitations imposed in subdivision (a). Services may include, but shall not be limited to, all of the following:

"(A) Maintaining contact between the parent and child through collect telephone calls.

"(B) Transportation services, when appropriate.

"(C) Visitation services, when appropriate.

"(D) (i) Reasonable services to extended family members or foster parents providing care for the child if the services are not detrimental to the child.

"(ii) An incarcerated or detained parent may be required to attend counseling, parenting classes, or vocational training programs as part of the reunification service plan if actual access to these services is provided. The social worker shall document in the child's case plan the particular barriers to an incarcerated, institutionalized, or detained parent's access to those court-mandated services and ability to maintain contact with his or her child.

"(E) Reasonable efforts to assist parents who have been deported to contact child welfare authorities in their country of origin, to identify any available services that would substantially comply with case plan requirements, to document the parents' participation in those services, and to accept reports from local child welfare authorities as to the parents' living situation, progress, and participation in services.

"(2) The presiding judge of the juvenile court of each county may convene representatives of the county welfare department, the sheriff's department, and other appropriate entities for the purpose of developing and entering into protocols for ensuring the notification, transportation, and presence of an incarcerated or institutionalized parent at all court hearings involving proceedings affecting the child pursuant to Section 2625 of the Penal Code. The county welfare department shall utilize the prisoner locator system

developed by the Department of Corrections and Rehabilitation to facilitate timely and effective notice of hearings for incarcerated parents."

[5] Section 384-b (7) (f) of the New York Social Services Law requires an "authorized agency" of the state to make " 'diligent efforts' . . . to assist, develop and encourage a meaningful relationship between the parent and child" by "(5) making suitable arrangements with a correctional facility and other appropriate persons for an incarcerated parent to visit the child within the correctional facility, if such visiting is in the best interests of the child. When no visitation between child and incarcerated parent has been arranged for or permitted by the authorized agency because such visitation is determined not to be in the best interest of the child, then no permanent neglect proceeding under this subdivision shall be initiated on the basis of the lack of such visitation. Such arrangements shall include, but shall not be limited to, the transportation of the child to the correctional facility, and providing or suggesting social or rehabilitative services to resolve or correct the problems other than incarceration itself which impair the incarcerated parent's ability to maintain contact with the child. When the parent is incarcerated in a correctional facility located outside the state, the provisions of this subparagraph shall be construed to require that an authorized agency make such arrangements with the correctional facility only if reasonably feasible and permissible in accordance with the laws and regulations applicable to such facility; and

"(6) providing information which the authorized agency shall obtain from the office of children and family services, outlining the legal rights and obligations of a parent who is incarcerated or in a residential substance abuse treatment program whose child is in custody of an authorized agency, and on social or rehabilitative services available in the community, including family visiting services, to aid in the development of a meaningful relationship between the parent and child. Wherever possible, such information shall include transitional and family support services located in the community to which an incarcerated parent or parent participating in a residential substance abuse treatment program shall return."

[6] Section 43-292.02 (2) (b) of the Nebraska Revised Statutes provides in relevant part that "[a] petition shall not be filed on behalf of the state to terminate the parental rights of the juvenile's parents or, if such petition has been filed by another party, the state shall not join as a party to the petition if the sole factual basis for the petition is that . . . the parent or parents of the juvenile are incarcerated. . . ."

[7] Section 32A-4-28 (D) of the New Mexico Statutes Annotated provides that "[t]he department shall not file a motion, and shall not join a motion filed by another party, to terminate parental rights when the sole factual basis for the motion is that a child's parent is incarcerated."